J-S75029-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

IN RE: A.B., MINOR  : IN THE SUPERIOR COURT OF
           :   PENNSYLVANIA
           :
           :
           :
           :
           :
           :
           :
APPEAL OF: J.M.K.    : No. 1091 WDA 2017

Appeal from the Order Entered June 26, 2017
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000200-2016

IN RE: M.K., MINOR  : IN THE SUPERIOR COURT OF
           :   PENNSYLVANIA
           :
           :
           :
           :
           :
           :
           :
APPEAL OF: J.M.K.    : No. 1092 WDA 2017

Appeal from the Order Entered June 26, 2017
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  CP-02-AP-0000199-2016

IN RE: C.-L.K.-B., MINOR  : IN THE SUPERIOR COURT OF
           :   PENNSYLVANIA
           :
           :
           :
           :
           :
           :
           :
APPEAL OF: J.M.K.    : No. 1093 WDA 2017

Appeal from the Order June 26, 2017
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000201-2016

J-S75029-17

BEFORE: SHOGAN, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                    FILED JANUARY 3, 2018

J.M.K. ("Mother") appeals from the orders entered June 26, 2017, in the Court of Common Pleas of Allegheny County, which involuntarily terminated her parental rights to her minor children, M.K., a female born in May 2012, A.B., a female born in August 2013, and C.-L.K.-B., a male born in March 2015 (collectively, "the Children").[1] After careful review, we affirm.

We summarize the relevant factual and procedural history of this matter as follows. Allegheny County Youth and Families ("CYF") obtained emergency custody of the Children on July 9, 2015, due to the deplorable condition of Mother's home, and her failure to provide adequate supervision. N.T., 6/23/2017, at 75-76. The record reveals that a police officer arrived at Mother's home to conduct a welfare check, after receiving a report that the grass was high, that there was garbage piled up outside, and that there were children present. Order – Involuntary Termination of Parental Rights (M.K.), 6/23/2017, Further Findings at ¶ 4(a)-(b).[2] When the officer peered through a window, he observed two of the Children in the home, along with a large

_____

[1] The trial court also terminated the parental rights of M.K.'s unknown father, and the parental rights of K.B., the putative father of A.B. and C.-L.K.-B. Neither K.B., nor any unknown father, appealed the termination of his parental rights.

[2] In its orders terminating Mother's parental rights, the trial court restated its previous findings of fact detailing this incident, which first appeared in the orders adjudicating the Children dependent. See CYF Exhibits 2-4 (certified dependency orders).

amount of debris scattered throughout the living room and kitchen. Id. at ¶ 3(c). The officer knocked on the door, but no one responded. Id. The officer then entered the home, and discovered garbage and clothing on the floor, as well as roaches and ants on the floor and countertops. Id. at ¶ 3(d)-(e). The only adult in the home was the Children's maternal grandmother, who was asleep.[3] Id. at ¶ 3(d). The trial court entered shelter care orders on July 16, 2015, and adjudicated the Children dependent on August 26, 2015. CYF Exhibits 2-4 (certified dependency orders).

On November 9, 2016, CYF filed petitions to involuntarily terminate Mother's parental rights to the Children. The orphans' court conducted a termination hearing on June 23, 2017. Following the hearing, on June 26, 2017, the court entered orders terminating Mother's parental rights. Mother timely filed notices of appeal on July 26, 2017, along with concise statements

---

[3] Mother was absent from the home because she was working. Order – Involuntary Termination of Parental Rights (M.K.), 6/23/2017, Further Findings at ¶ 4(h). The police later arrested Mother and charged her with three counts each of endangering the welfare of children and recklessly endangering another person. Id. at ¶ 4(i); CYF Exhibit 5 (documents from Mother's criminal case). As a condition of Mother's bail, the trial court in the criminal case entered a no-contact order preventing her from visiting with the Children. Order – Involuntary Termination of Parental Rights (M.K.), 6/23/2017, Further Findings at ¶ 4(j); N.T., 6/23/2017, at 79. The court lifted the order in November 2015, and Mother began visiting that same month. N.T., 6/23/2017, at 86. Mother pled guilty to one count of endangering the welfare of children, and received a sentence of three years' probation in January 2016. Id. at 78, 105-06; CYF Exhibit 5 (documents from Mother's criminal case).

of errors complained of on appeal. Mother filed amended notices of appeal and concise statements on July 28, 2017.[4]

Mother now raises the following issues for our review.

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §[]2511(a)(2), (5), and (8)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the children pursuant to 23 Pa.C.S. §[]2511(b)?

Mother's brief at 28 (orphans' court answers omitted).[5]

We review these claims mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

_____

[4] Mother misstated A.B.'s last name in her original notices of appeal. She amended her notices of appeal to correct this mistake.

[5] Counsel for M.K. filed a brief in this Court supporting Mother's appeal. Counsel for A.B. and C.-L.K.-B. filed a brief supporting the termination of Mother's parental rights.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc), appeal denied, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provides as follows.

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those

grounds may include acts of refusal as well as incapacity to perform parental duties." In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the orphans' court found that Mother failed to remedy the circumstances resulting in the Children's placement in foster care, and that it is doubtful that she will remedy those circumstances in the future. Order – Involuntary Termination of Parental Rights (M.K.), 6/26/2017, Further Findings at ¶ 24-25. The court explained that Mother continues to lack stable housing, and has not adequately addressed her mental health needs. Id.

Mother argues that she complied with her reunification objectives and remedied her parental incapacity. Mother's brief at 36, 42-43. She insists that any evidence or argument to the contrary is unclear or speculative, and that "[i]t would be contrary to the purpose of establishing and requiring a parent to pursue reunification goals if after doing so the parent is told that his or her efforts are still not good enough." Id. at 37, 42.

Our review of the record supports the findings of the orphans' court. During the termination hearing, CYF presented the testimony of caseworker, Mary Hughes. Ms. Hughes testified that Mother's reunification objectives included reengaging with mental health treatment, improving her parenting abilities, and obtaining housing.[6] N.T., 6/23/2017, at 82.

_____

[6] Mother's objectives also included notifying her attorney and CYF when the trial court in her criminal matter lifted its no-contact order. N.T., 6/23/2017, at 81-82. As explained above, the court lifted the no-contact order in November 2015. Id. at 86.

Concerning Mother's compliance with these objectives, Ms. Hughes testified that CYF referred Mother for mental health treatment, but that she failed to participate consistently. Id. at 87-89, 95-97, 146. Ms. Hughes explained that mental health treatment was necessary for Mother because she displayed anger and "threatening behavior" toward caseworkers and service providers. Id. at 82. For example, Ms. Hughes described an incident that took place in April 2016. Id. at 101. Mother had been visiting with the Children every Monday, Wednesday, and Friday, but she requested that her Wednesday visits be eliminated due to her work schedule. Id. at 101-02. Mother later called to confirm a Wednesday visit, and "became enraged" when she was told the visit would not take place. Id. at 102. Mother came to the CYF office and confronted Ms. Hughes, who asked security personnel to escort her out of the building. Id. Mother then went to the Children's foster home, "and the police were called." Id.

With respect to parenting, Ms. Hughes testified that Mother completed a parenting program in December 2015, and participated in ongoing parenting instruction as part of her visits with the Children. Id. at 86, 111-12. Mother attended her visits with the Children consistently for most of their dependency, although there was a period of inconsistent visitation from December 2016 until approximately March 2017. Id. at 112-15. Ms. Hughes testified that Mother's visits were initially unsupervised, but that they became supervised as a result of Mother's behavior during a visit in June 2016. Id. at

115-16.  She explained that Mother arrived for the visit "upset and erratic" and yelled at M.K.[7]  Id. at 102-03, 116.

Finally, Ms. Hughes testified that CYF referred Mother for housing assistance, but that she failed to obtain a stable residence.  Id. at 82-85.  Mother moved in with her stepmother after CYF obtained emergency custody of the Children in July 2015.  Id. at 107.  Mother stayed there until moving in with her maternal grandmother in December 2015.  Id. at 107-08.  Mother obtained her own apartment in December 2016, but left almost immediately.  Id. at 108.  Ms. Hughes explained that Mother contacted her and informed her that she and her brother "were in a war," that "her friend shot off a warning shot to her brother," and that Mother was afraid that her brother would shoot her and the Children.  Id. at 103, 109.  Mother indicated that her

_____

[7] Mother's parenting instructor, Mary Safran, described this incident as follows.

> [W]hat I witnessed when I walked into the room, [Mother] seemed to be in a manic state.  And she -- I was not able to reason with her, and she was screaming at [M.K.], were you molested, did anybody touch you.  And she was pointing and touching [M.K.'s] vagina, saying I want to know.  And [M.K.] was completely terrified.  The other two were crying, so I just -- I tried to calm [Mother] because I wanted to see why she was behaving this way.  I wasn't able to calm her.  I picked up all the children.  I took them out of the room and I said the visit's over.  And then security told [Mother] to leave.

N.T., 6/23/2017, at 167.  Ms. Safran testified that M.K. did not behave in a way that was indicative of sexual abuse, and that Mother "really wasn't making any sense of why she felt that way."  Id. at 186.

new apartment was not safe, and that she was staying with a friend. Id. at 104. "[W]ithin the last few months" Mother stated that she was again residing with her stepmother.[8] Id. at 110.

Thus, the record confirms that Mother is incapable of parenting the Children, and that she cannot, or will not, remedy her parental incapacity. At the time of hearing, Mother's mental health and parenting skills remained inadequate, as demonstrated by her erratic behavior and outbursts during visits with the Children. Mother also remained without stable housing. Mother has had two years of opportunities to remedy these concerns and demonstrate that she can provide the Children with the stability and permanence they need. She has failed to do so, and the Children cannot wait forever. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." In re Adoption of R.J.S., 901 A.2d 502, 513 (Pa. Super. 2006).

We next consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b).

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional

---

[8] Ms. Hughes did not believe that the Children could be reunified with Mother while she was residing with her stepmother, because there are "other family members that live there," and because the stepmother had physically abused Mother as a child, resulting in a criminal conviction. N.T., 6/23/2017, at 111, 130-31.

needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the orphans' court concluded that terminating Mother's parental rights would best serve the Children's needs and welfare. Order – Involuntary Termination of Parental Rights (M.K.), 6/26/2017, Further Findings at ¶ 27. The court found that A.B. and C.-L.K.-B. are bonded primarily to their foster mother, rather than Mother. Id. While the court found that M.K.'s bond with Mother is more significant, it reasoned that M.K.'s need for permanence outweighs this bond. Id.

Mother argues that the Children are strongly bonded to her, and that terminating her parental rights will deny the Children her love and

companionship. Mother's brief at 37-38, 44-45. Mother emphasizes the testimony of psychologist, Neil Rosenblum, Ph.D., who opined that the Children would benefit from ongoing contact with her. Id.

Our review of the record again supports the findings of the orphans' court. During the hearing, Dr. Rosenblum testified that he completed several evaluations of Mother, the Children, and the Children's foster mother, including interactional evaluations in October 2016 and February 2017. N.T., 6/23/2017, 13-14; CYF Exhibit 1 (evaluations). Based on these evaluations, Dr. Rosenblum testified that he observed a "significant and concerning deterioration" of the relationship between the Children and Mother. Id. at 20. He explained,

> . . . . Mother seemed to be very motivated when I met with her in October. She worked hard at doing things with the children. While she still could be a bit temperamental, she did really try to give each child individual attention and to give them praise.
>
> In the second evaluation she was alarmingly flat, almost indifferent to doing things with the children and really showed no enthusiasm, no enjoyment, and no interest, really, in engaging in any type of educational types of activities with the children or spending quality time with them. The children's behavior rapidly deteriorated during the course of the evaluation. They became somewhat aggressive. There were a lot of conflicts, and eventually, the children just wanted out of the -- out of the room. [C.-L.K.-B.] cried. . . . He didn't actually want to leave his foster mother at the onset of the session . . . .

Id. at 20-21.

Dr. Rosenblum further testified that he conducted an individual evaluation of M.K. in June 2016, in response to an incident during which she

"started screaming at her mother during the visit, 'Just kill me,' and curling up in a ball and sobbing in a fetal-like position." Id. at 24. Dr. Rosenblum opined that M.K.'s behavior resulted from the confusion, uncertainty, and "push-pull" that she experiences because of her desire to maintain an attachment with Mother, and because of Mother's statements during visits that she will be coming home soon. Id.

Ultimately, Dr. Rosenblum testified that all three of the Children have a more significant relationship with their foster mother than they do with Mother. Id. at 23. M.K. and A.B. display a "mixed attachment." Id. at 22. Both children desire love and attention from Mother, but they have "transferred their attachment, on a more primary basis," to their foster mother.[9] Id. at 22-23. C.-L.K.-B. entered foster care as an infant, such that his primary attachment has always been to his foster mother. Id. at 22-23. Dr. Rosenblum opined that the remaining attachment that the Children have with Mother is not necessary or beneficial, and that terminating Mother's parental rights would serve the Children's needs and welfare. Id. at 26, 28-29. He explained, "I do believe that termination of parental rights is, at this

_____

[9] Dr. Rosenblum testified that M.K. "for the most part, [] indicates that she wants to live with" her foster mother. N.T., 6/23/2017, at 62. However, Ms. Safran testified that M.K.'s preference is to return to Mother's care. Id. at 185, 190. M.K.'s counsel also stated that her preference is to return to Mother's care, and the orphans' court found as a fact that M.K. wants to live with Mother. Id. at 235; Order – Involuntary Termination of Parental Rights (M.K.), 6/26/2017, Further Findings at ¶ 23.

point, the only way to help these children resolve their conflict and provide them with a sense of stability and an opportunity for -- for future growth in a family environment that is fully supportive of their needs." Id. at 28-29. While Dr. Rosenblum recommended that the Children, and M.K. in particular, have ongoing visits and "a therapeutic resolution" with Mother, he opined that Mother's parental rights should be terminated even in the absence of visits. Id. at 23, 25, 44-45.

Thus, the record confirms that terminating Mother's parental rights will best serve the Children's needs and welfare. A.B. and C.-L.K.-B. are bonded primarily to their foster mother, rather than Mother. In addition, while M.K.'s preference is to return to Mother's care, it is clear that preserving Mother's parental rights will only serve to harm M.K. by prolonging her confusion and uncertainty.

> [M.K.]'s bond i[s] growing every day with [her foster mother] and diminishing with her Mother. While there is a "residual" bond between [M.K.] and her Mother, I find that' the bond is not particularly healthy. Hopefully, [Foster Mother] will permit continued contact post -adoption. However, I find that the need for permanence outweighs the need to continue this residual bond with [M.K.] and her Mother and that the uncertainty and lack of permanence for [M.K.] is harmful to her welfare.

Order – Involuntary Termination of Parental Rights (M.K.), 6/26/2017, Further Findings at ¶27. It was within the discretion of the orphans' court to accept Dr. Rosenblum's recommendation, and conclude that only termination will provide the Children with the permanence and stability that they need.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights to Children involuntarily. Therefore, we affirm the court's June 26, 2017 orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/3/2017